# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 14, 2015 Session

## PATRICIA BAZEMORE v. PERFORMANCE FOOD GROUP, INC., ET AL.

### Appeal from the Circuit Court for Hamilton County
### No. 13C1170     W. Jeffrey Hollingsworth, Judge

---

### No. E2014-01877-COA-R3-CV-FILED-JULY 30, 2015

---

Patricia Bazemore brought this action against her former employer, Performance Food Group, Inc. (PFG) and Barry Pearson, a former employee of PFG. Ms. Bazemore claimed that, while she and Mr. Pearson were working for PFG, she was subjected to a pattern of unwanted sexual harassment by him – conduct that she alleges created a hostile work environment in violation of the Tennessee Human Rights Act (THRA). As a result of the unwanted sexual harassment, Ms. Bazemore also alleged constructive discharge, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent supervision and retention.[1] PFG subsequently filed a motion for summary judgment, contending that no genuine issue of material fact exists in support of Ms. Bazemore's claims against PFG as an entity. The trial court ultimately granted PFG's motion for summary judgment after finding (1) no evidence of a hostile work environment; (2) facts indicating that PFG took reasonable steps to prevent sexual harassment from occurring; (3) proof that PFG's response to Ms. Bazemore's complaint was objectively reasonable; (4) insufficient evidence to support the claims of either intentional or negligent infliction of emotional distress; and (5) no proof of negligent retention and supervision by PFG. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
### Circuit Court Affirmed

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Grace E. Daniell, Chattanooga, Tennessee, for the appellant, Patricia Bazemore.

---

[1] Ms. Bazemore further alleged a charge of assault and battery solely against Mr. Pearson, who was not a party to PFG's motion for summary judgment. As the appeal before us only pertains to PFG's motion, any extended discussion of the assault and battery charge is unnecessary.

Neil A. Brunetz, Robert F. Parsley, and Jennifer W. Terry, Chattanooga, Tennessee, for the appellee, Performance Food Group, Inc.

**OPINION**

**I.**

PFG is a Colorado corporation that operates as a food distributor throughout the United States. In April 2011, Ms. Bazemore accepted a position with PFG as an area sales manager in PFG's Chattanooga office. As an area sales manager, Ms. Bazemore was responsible for selling food products to restaurants in and around the Chattanooga area. During her time with PFG, Ms. Bazemore reported directly to Joe Davis, the District Sales Manager for PFG's Chattanooga office. In April 2012, PFG hired Mr. Pearson as an additional area sales manager.

Though Ms. Bazemore's position with PFG primarily entailed visiting customers around the Chattanooga area, she frequently had to go to PFG's office to take care of paperwork, pick up samples and products for clients, and meet with her supervisors. On September 10, 2012, Ms. Bazemore and Mr. Pearson were alone in PFG's office. While Ms. Bazemore was looking through invoices and preparing a delivery for one of her clients, Mr. Pearson made inappropriate comments and directed multiple lewd questions toward Ms. Bazemore: (1) "I'll help your a** and what a nice a** it is;" (2) "It's hard to walk with your d*ck hard;" (3) "Do you need anything licked, I mean carried?;" and (4) "Don't you bend over, don't you do it. I'll get that a**." In addition, Mr. Pearson allegedly grabbed and squeezed Ms. Bazemore's buttocks. Ms. Bazemore was able to record a portion of this encounter on her cell phone. However, she did not immediately report Mr. Pearson's behavior to PFG.

On October 3, 2012, Ms. Bazemore was again alone in the PFG office with Mr. Pearson. After a brief exchange, Mr. Pearson showed Ms. Bazemore a picture of a man's testicles. As she had done during their September 10 encounter, Ms. Bazemore secretly recorded their interaction, and Mr. Pearson's comments were again inappropriate. Specifically, after Mr. Pearson had shown Ms. Bazemore the picture, he said, "I took this picture this morning. Look at this son of a b****. That's my ball sac. It's f***ing hanging to the ground . . . How would you like to have them babies slapping that little heinie?" In addition, Mr. Pearson allegedly slapped Ms. Bazemore on her buttocks yet again. Similar to the September 10 incident, Ms. Bazemore did not immediately report Mr. Pearson's behavior to PFG.

2

On October 8, 2012, Ms. Bazemore called PFG's Human Resources Director, Denise Pollock on the phone, and left a voicemail requesting that Ms. Pollock call her back. In her message, Ms. Bazemore did not provide any indication why she was contacting Ms. Pollock, who testified in her deposition that it was not unusual for an area sales manager to call her. Ms. Pollock stated that she did not return Ms. Bazemore's call because they were going to see one another at an upcoming sales meeting. However, Ms. Pollock was unable to speak to Ms. Bazemore at the sales meeting, as Ms. Pollock was too busy coordinating a health fair organized by PFG. Ms. Bazemore called Ms. Pollock again on October 17, 2012, and left a second voicemail requesting that Ms. Pollock call her back. Ms. Pollock testified that on October 18, 2012, she finally spoke with Ms. Bazemore, who briefly described her two prior encounters with Mr. Pearson. Ms. Pollock stated in her deposition that she requested that Ms. Bazemore provide her with a written statement detailing both encounters.

In her deposition, Ms. Bazemore testified that she felt more comfortable speaking with Ms. Pollock about her encounters with Mr. Pearson than she would have felt going to her supervisor, Mr. Davis. Specifically, Ms. Bazemore believed that Mr. Davis was "drinking buddies" with Mr. Pearson and that they had a similar attitude towards women. In addition, Ms. Bazemore highlighted several instances where Mr. Davis made comments that were either lewd or insulting to women. Ms. Bazemore alleged that on August 28, 2012, Mr. Davis answered two phone calls in her presence by saying "c*ck and balls" in her presence. On August 31, 2012, Ms. Bazemore secretly recorded Mr. Davis when he (1) referred to a female customer as a "fine little filly;" (2) described another female customer as "hot as hell;" (3) called female Area Sales Manager Jessi Lanuza a "dodo" and spoke to Ms. Lanuza in a mocking tone. On September 20, 2012, Ms. Bazemore secretly recorded Mr. Davis again when he referred to Ms. Lanuza as a "dodo." Finally, on September 28, 2012, Ms. Bazemore recorded Mr. Davis when he talked about a customer who had "ti**ies out to here" and rhetorically asked, "Who is this stripper?" In the end, Ms. Bazemore believed that Mr. Davis would not take her or her allegations against Mr. Pearson seriously. Ms. Bazemore, however, did not report Mr. Davis' inappropriate comments to PFG and did not disclose her secret recordings of him until after she resigned on January 15, 2013.

On October 19, 2012, Ms. Bazemore sent Ms. Pollock an email detailing her encounters with Mr. Pearson. At that time, however, Ms. Bazemore did not provide Ms. Pollock with the audio recordings she had made of Mr. Pearson or even disclose their existence. On October 22, 2012, Ms. Pollock and Mr. Davis interviewed Mr. Pearson, who admitted that he had shown Ms. Bazemore a picture of a man's testicles. Mr. Pearson, however, maintained that Ms. Bazemore had asked to see the photograph. Further, Mr. Pearson denied the rest of Ms. Bazemore's allegations against him. At that

point, Ms. Pollock told Mr. Pearson that he was no longer allowed to have contact with Ms. Bazemore, and Mr. Davis informed him that he was not to go to the office.

Ms. Bazemore met with both Ms. Pollock and Mr. Davis on October 22, 2012, to discuss her allegations against Mr. Pearson, as set forth in her October 19, 2012 email. In her deposition, Ms. Bazemore testified that she recounted the details of both instances when she alleged that Mr. Pearson had physically assaulted her. Ms. Bazemore also stated that she was asked whether an apology from Mr. Pearson would help, to which she replied no. Ms. Bazemore testified that she "did not feel comfortable being around [Mr. Pearson] at all" and that she "never wanted to see his face again" or "be in the same room with him or be around him at all." Further, Ms. Bazemore stated that she told Ms. Pollock and Mr. Davis that the entire situation had made her "physically ill" and that her "stomach had been in a knot." At the conclusion of the meeting, Ms. Pollock informed Ms. Bazemore that her allegations conflicted with Mr. Pearson's account of what had transpired, but indicated that PFG's investigation would continue. Though Ms. Bazemore possessed audio recordings verifying most of her allegations against Mr. Pearson at that time, she still neglected to provide Ms. Pollock and Mr. Davis with these recordings.

Ms. Bazemore sent Ms. Pollock an email on October 24, 2012, with additional information to refute portions of Mr. Pearson's claims. Ms. Pollock, however, replied a few hours later indicating that the investigation had concluded and that she would follow up with Ms. Bazemore regarding how PFG intended to handle the situation. On October 25, 2012, Ms. Bazemore met with Ms. Pollock, Mr. Davis, and Doug Burley, PFG's Vice President of Sales, to discuss the results of the investigation. During the meeting, Ms. Bazemore discovered that Mr. Pearson had been issued a final written warning and would no longer have unrestricted access to PFG's Chattanooga office. Further, Ms. Bazemore was informed that she would no longer have one-on-one contact with Mr. Pearson going forward. Finally, Ms. Bazemore was reminded of how she should lodge a complaint if a similar incident occurred in the future and was told that she should call Ms. Pollock, Mr. Davis, or Mr. Burley if Mr. Pearson tried to interact with her again. Though Ms. Bazemore was very disappointed with PFG's decision to issue only a final written warning to Mr. Pearson, she still failed to disclose the audio recordings of Mr. Pearson's conduct that would have likely precipitated a more severe punishment.

Following the October 24, 2012 meeting, PFG instituted changes regarding when area sales managers would have access to the Chattanooga office. Under PFG's new policy, effective November 30, 2012, all area sales managers were allowed to use the office only between the hours of 6:30am to 8:00am, 11:30am to 12:30pm, and 4:30pm to 6:00pm. If an area sales manager needed to access the office during off hours, he or she

4

was instructed to call Mr. Davis directly to explain why. Mr. Davis relayed this new office policy to all of his area sales managers in a November 29, 2012 email.

Prior to PFG's new policy taking effect, Ms. Bazemore encountered Mr. Pearson as he was leaving the office on November 26, 2012. On that day, Mr. Pearson was with Brad Handley, PFG's Vice President of Merchandising, and had contacted Mr. Davis because Mr. Handley wanted to see the office, which was relatively new at the time. Mr. Davis subsequently gave Mr. Pearson permission to visit the office with Mr. Handley. Later on, as Ms. Bazemore was walking from her car toward the office, she saw Mr. Pearson leave the office and lock the front door. Ms. Bazemore immediately turned around, got into her car, and left the area. During this encounter, Mr. Pearson never saw Ms. Bazemore, who subsequently sent an email to Ms. Pollock about seeing Mr. Pearson at the office. Ms. Bazemore complained that she had been assured she would not have any direct contact with Mr. Pearson. In response, Ms. Pollock instructed Mr. Davis to notify Ms. Bazemore prior to any time Mr. Pearson had to be in the office so that Ms. Bazemore could avoid running into him again. Thereafter, Mr. Pearson and Ms. Bazemore never again had one-on-one contact.

On January 15, 2013, Ms. Bazemore met with Mr. Davis and Mr. Burley for a performance evaluation. At that meeting, however, Ms. Bazemore submitted a letter of resignation. In her letter, Ms. Bazemore listed a number of allegations against Mr. Davis, as detailed earlier in this opinion, which she had previously failed to mention prior to resigning. Further, Ms. Bazemore highlighted multiple allegedly retaliatory actions by PFG that she claimed were directly related to her decision to lodge a complaint against Mr. Pearson, in particular: (1) her inability to add on to an order for a client after the deadline had passed; (2) longer and more thorough performance evaluations; and (3) restrictions on office hours that applied to all PFG employees in Chattanooga. Ms. Bazemore indicated that she became physically ill[2] in Mr. Pearson's presence and that, ultimately, "[Mr. Pearson's] harassment and PFG's perpetuation of this hostile work environment . . . severely impacted [her] ability to focus on [her] job." Yet again, Ms. Bazemore failed to disclose her secret audio recordings of Mr. Pearson and Mr. Davis.

Despite her professed inability to focus on her job during her last few months with PFG, Ms. Bazemore had engaged in discussions about a new job with Atlantic Distributors, Inc. (ADI), as early as November 2012. After touring ADI's warehouse, Ms. Bazemore received a job offer on November 6, 2012. Ultimately, she accepted the

---

[2] Despite her claims of intentional infliction of emotional distress and negligent infliction of emotional distress, Ms. Bazemore never sought either medical or psychological treatment at any point following the alleged harassment she experienced at PFG.

job offer in January 2013, prior to her January 15 meeting with Mr. Davis and Mr. Burley.

Ms. Bazemore filed a complaint against both PFG and Mr. Pearson on September 5, 2013, and an amended complaint on August 4, 2014. She alleged sexual harassment in violation of the THRA, constructive discharge, intentional infliction of emotional distress, negligent infliction of emotional distress, assault and battery against Mr. Pearson individually, and negligent supervision and retention. On July 25, 2014, PFG filed a motion for summary judgment. In a September 16, 2014 memorandum order, the trial court granted PFG's motion for summary judgment, noting that (1) PFG took reasonable steps to prevent sexual harassment from occurring and provided reasonable steps by which employees could file a complaint concerning sexual harassment in the workplace; (2) PFG's efforts to discipline Mr. Pearson and prevent Mr. Pearson from interacting with Ms. Bazemore were objectively reasonable; (3) there was insufficient evidence to support Ms. Bazemore's claims of intentional and negligent infliction of emotional distress as there was no indication in the record of any actions by PFG that would indicate intent or negligence and no evidence that Ms. Bazemore suffered a serious mental injury as a result of her alleged harassment; and (4) PFG acted reasonably in retaining Mr. Pearson based upon the information it had available, and Ms. Bazemore never filed a complaint regarding Mr. Davis' behavior while she was working at PFG. Ms. Bazemore subsequently filed a notice of appeal on September 25, 2014, contending that the trial court erred by granting PFG's motion for summary judgment.

## II.

Because Ms. Bazemore's complaint was filed after July 1, 2011, Tenn. Code Ann. § 20-6-101 (Supp. 2014) applies to our analysis of summary judgment in this case. That statute provides:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
>
> (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or
>
> (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

6

Tenn. Code Ann. § 20-16-101. *See also* **Huddleston v. Harper**, No. E2014-01174-COA-R3-CV, 2015 WL 3964791, at *3 (Tenn. Ct. App. E.S., June 30, 2015); **Harris v. Metro. Dev. & Housing Agency**, No. M2013-01771-COA-R3-CV, 2014 WL 1713329, at *3 (Tenn. Ct. App. M.S., Apr. 28, 2014); **Wells Fargo Bank, N.A. v. Lockett**, No. E2013-02186-COA-R3-CV, 2014 WL 1673745, at *2 (Tenn. Ct. App. E.S., Apr. 24, 2018). In **Harris**, this Court explained when summary judgment was appropriate and our standard of review on appeal:

> Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitle to a judgment as a matter of law.
>
> Summary judgments do not enjoy a presumption of correctness on appeal. The resolution of a motion for summary judgment is a matter of law, thus, we review the trial court's judgment de novo with no presumption of correctness. The appellate court makes a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied.

**Harris**, 2014 WL 1713329, at *3 (internal citations and quotation marks omitted.) When reviewing a trial court's grant of summary judgment on appeal,

> [w]e must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. If the undisputed fact support only one conclusion, then the court's summary judgment shall be upheld because the moving party was entitled to judgment as a matter of law.

**Wells Fargo Bank**, 2014 WL 1673745, at *2 (internal citations omitted.)

### III.

Ms. Bazemore alleges that Mr. Pearson's harassment and PFG's failure to respond adequately to her complaint created a hostile work environment that subsequently resulted in her constructive discharge. A hostile work environment exists when "conduct has the purpose or effect of unreasonably interfering with an individual's work

performance or creating an intimidating, hostile, or offensive working environment." ***Campbell v. Fla. Steel Corp.***, 919 S.W.2d 26, 31 (Tenn. 1996) (quoting ***Meritor Sav. Bank, FSB v. Vinson***, 477 U.S. 57, 65 (1986)). In ***Campbell***, the Tennessee Supreme Court set forth what an employee must assert and prove in order to prevail on a hostile work environment claim in a sexual harassment case:

> (1) the employee is a member of a protected class; (2) the employee was subjected to unwelcomed sexual harassment; (3) the harassment occurred because of the employee's gender; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew, or should have known of the harassment and failed to respond with prompt and appropriate corrective action.

***Campbell***, 919 S.W.2d at 31 (citing ***Rabidue v. Osceola Ref. Co., a Div. of Texas-American Petrochemicals, Inc.***, 805 F.2d 611, 620 (6th Cir. 1986)) (internal quotation marks omitted.) When determining whether an environment is hostile or abusive, we must consider the totality of the circumstances. ***Campbell***, 919 S.W.2d at 32.

In order to establish a claim for constructive discharge based upon a hostile work environment, "an employee must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person would resign her employment." ***Frye v. St. Thomas Health Servs.***, 227 S.W.3d 595, 611 (Tenn. Ct. App. M.S., 2007) (quoting ***Campbell***, 919 S.W.2d at 34.) Further, the alleged harassment must have been severe or pervasive in nature, and not simply an isolated incident. ***Campbell***, 919 S.W.2d at 34.

In the present case, Ms. Bazemore alleged that Mr. Pearson sexually harassed her on September 10, 2012, and again on October 3, 2012. Nevertheless, Ms. Bazemore did not make any effort to notify PFG of Mr. Pearson's inappropriate comments and alleged groping until she left a voicemail with Ms. Pollock on October 8, 2012, nearly one month after the first incident. Further, when she initially contacted Ms. Pollock, Ms. Bazemore did not provide any indication that her call pertained to multiple instances of sexual harassment. Such advance notice could have certainly alerted PFG about the possible need for urgent corrective action. Rather, Ms. Bazemore simply waited for Ms. Pollock to call her back before leaving Ms. Pollock another voicemail on October 17, 2012. As with her first voicemail, Ms. Bazemore again neglected to mention the reason for her call.

When Ms. Pollock finally spoke with Ms. Bazemore on October 18, 2012, and learned, for the first time, of the allegations against Mr. Pearson, she immediately

directed Ms. Bazemore to provide the details surrounding both incidents in a written statement, which Ms. Pollock received on Friday, October 19, 2012. On October 22, 2012, the following Monday, Ms. Pollock and Mr. Davis conducted separate interviews of Mr. Pearson and Ms. Bazemore. During the preliminary stages of the investigation, Mr. Pearson was informed that he was no longer allowed to have contact with Ms. Bazemore and was not to go to the office. During this initial meeting, Ms. Bazemore was told that Mr. Pearson's version of events conflicted with her allegations. Rather than turn over her audio recordings, which would have verified that Mr. Pearson actually made the inappropriate comments that she had alleged, Ms. Bazemore remained silent about this incriminating evidence. When PFG had concluded its investigation and decided that a final written warning was an appropriate punishment for Mr. Pearson, Ms. Bazemore still kept her audio recordings a secret. Ultimately, the trial court deemed that PFG's response to Ms. Bazemore's complaint was reasonable given the information available to PFG at the time. We agree with the trial court.

While Mr. Pearson's comments were certainly inappropriate, PFG had no tangible evidence to verify that they were actually made. Rather, PFG was forced to analyze conflicting stories by Mr. Pearson and Ms. Bazemore and render a decision based wholly upon uncorroborated testimony by two opposing parties. We agree with the trial court that PFG's decision to prohibit one-on-one contact between Mr. Pearson and Ms. Bazemore and restrict Mr. Pearson's access to the office is objectively reasonable in light of the evidence actually available to PFG during the investigation. In the end, PFG cannot be faulted for failing to analyze incriminating evidence that was never made available to it prior to Ms. Bazemore's decision to leave the company, incriminating evidence which was solely in the possession and under the control of Ms. Bazemore.

When considering Ms. Bazemore's claim of constructive discharge as a result of a hostile work environment, one can hardly say that PFG knowingly permitted conditions of discrimination in employment that were so intolerable that a reasonable person in Ms. Bazemore's position would have resigned. As mentioned earlier, PFG immediately initiated an investigation into Ms. Bazemore's complaint when they ultimately received notice of her allegations against Mr. Pearson. PFG subsequently placed restrictions on Mr. Pearson's activities at work, such that he would have no future interactions with Ms. Bazemore. Though Ms. Bazemore briefly saw Mr. Pearson leaving the office on November 26, 2012, it is undisputed that Ms. Bazemore did not have any direct contact with Mr. Pearson during the remainder of her time at PFG. As a result, one brief and unintentional encounter, during which Mr. Pearson never even saw Ms. Bazemore, would not be pervasive or severe enough to justify a claim of constructive discharge. Furthermore, a constructive discharge claim in this context appears even weaker when considering the preventative measures PFG had in place from the outset to eliminate

sexual harassment. Specifically, all new employees, during their initial orientation, were given an employee handbook containing PFG's Code of Conduct and anti-harassment policy. In addition, all PFG employees were required to take online computer training courses annually as part of their recertification for sexual harassment training. Finally, PFG's anti-harassment policy had an articulated framework for addressing sexual harassment complaints in the workplace by requiring that employees inform PFG immediately regarding any conduct believed to constitute harassment.

Though Ms. Bazemore failed to follow the prescribed reporting procedures and decided to withhold important matters regarding the alleged harassment, PFG nonetheless had a framework in place to eradicate sexual harassment from the workplace through its anti-harassment policy, training of employees, annual recertification of employees, and prompt investigation when made aware of Ms. Bazemore's claims. Thus, we believe that PFG took reasonable steps to prevent sexual harassment in the workplace and to respond to Ms. Bazemore's allegations, steps sufficient to rebut Ms. Bazemore's allegations of either a hostile work environment or constructive discharge as a result of a hostile work environment.

As for Ms. Bazemore's claims regarding retaliatory actions by PFG following her complaint against Mr. Pearson, we find her arguments on this issue to be without merit. Specifically, Ms. Bazemore highlighted three allegations of retaliation by PFG in her brief: (1) her inability to add on to an order for a client after the deadline had passed; (2) longer and more thorough performance evaluations; and (3) restrictions on office hours. To start, we do not see how PFG's decision to enforce order deadlines can be classified, absent more evidence, as retaliatory. In addition, we find no significance in PFG's decision to give Ms. Bazemore more thorough performance evaluations in the wake of her complaint against Mr. Pearson. Requiring that Ms. Bazemore actually undergo a performance evaluation as opposed to simply filling out an evaluation of herself, as she indicated she had done in the past, can hardly be viewed as retaliatory. Finally, though Ms. Bazemore attempts to characterize PFG's new office hours as retaliatory against her alone, all PFG employees in the Chattanooga office were subjected to these new hours. There is simply no evidence in the record that Ms. Bazemore was either singled out by PFG or required to work longer hours as a result of the new office policy, despite her claim to the contrary in her brief. Ultimately, we do not find sufficient evidence to support Ms. Bazemore's claims of retaliation by PFG.

**IV.**

We are similarly not persuaded by Ms. Bazemore's claims of either intentional infliction of emotional distress or negligent infliction of emotional distress. To sustain a

claim of intentional infliction of emotional distress, a plaintiff must prove that the defendant's conduct was "(1) *intentional or reckless*, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." ***Akers v. Prime Succession of Tenn., Inc.***, 387 S.W.3d 495, 502 (Tenn. 2012) (quoting ***Rogers v. Louisville Land Co.***, 367 S.W.3d 196, 205 (Tenn. 2012)) (emphasis in ***Akers***.) As discussed above, the record does not reflect any intent or recklessness on the part of PFG. Rather, PFG's anti-harassment policies were clearly articulated; annual recertification was mandated to ensure that all employees were up to date on the company's sexual harassment policy; and PFG's investigation into Ms. Bazemore's allegations was promptly commenced when PFG received notice of her claims and rendered a reasonable punishment in light of the evidence then available to it. Given such facts, we find that there is insufficient evidence to justify a claim of intentional infliction of emotional distress against PFG.

Ms. Bazemore's claim for negligent infliction of emotional distress also fails. To establish a viable claim for negligent infliction of emotional distress, a plaintiff must "present material evidence as to each of the five elements of general negligence – duty, breach of duty, injury or loss, causation in fact, and proximate, or legal cause . . . in order to avoid summary judgment." ***Camper v. Minor***, 915 S.W.2d 437, 446 (Tenn. 1996) (internal citations omitted.) Further, "the claimed injury or impairment must be supported by expert medical or scientific proof." ***Id.*** In the present case, there is no indication anywhere in the record that Ms. Bazemore ever sought medical or psychological treatment following her alleged harassment. In the absence of expert medical or scientific proof, there is insufficient evidence to support Ms. Bazemore's claim of negligent infliction of emotional distress.

## V.

Lastly, we agree with the trial court's conclusion that there is insufficient evidence in the record to support Ms. Bazemore's claim of negligent retention and supervision. "A plaintiff in Tennessee may recover for negligent hiring, supervision or retention of an employee if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness of the job." ***Doe v. Catholic Bishop for Diocese of Memphis***, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008) (citing ***Phipps v. Walker***, No. 03A01-9508-CV-00294, 1996 WL 155258, at *3 (Tenn. Ct. App. W.S., April 4, 1996)). In the present action, the record reflects that Mr. Pearson was interviewed and vetted prior to being offered a job as an area sales manager, including a background check. Further, the record indicates that Mr. Pearson underwent the same orientation training and took the same annual online recertification courses as did all other PFG employees. In addition, Ms. Bazemore withheld incriminating audio

11

recordings of Mr. Pearson that were material to this very issue and could have enabled PFG to take more meaningful and corrective action sooner. When PFG finally heard the audio recordings of Mr. Pearson during the discovery phase of this case, he was promptly terminated. In the absence of such evidence, PFG's decision to issue a formal warning, restrict office access, and forbid Mr. Pearson from interacting with Ms. Bazemore seems reasonable in retrospect. Considering all of the above, we believe that PFG's decision to hire, retain, and supervise Mr. Pearson was not negligent.

As for Mr. Davis, Ms. Bazemore never filed a complaint with PFG regarding his inappropriate comments. Rather, her first actual allegation that Mr. Davis was behaving inappropriately came in her January 15, 2013 resignation letter. Mr. Davis had been interviewed and vetted prior to joining PFG. Further, he underwent the company-mandated orientation and took the annual online recertification courses, just as all other PFG employees had done. Ultimately, Ms. Bazemore withheld incriminating audio recordings of Mr. Davis that were material to this issue and could have enabled PFG to take corrective action sooner. Just as with Mr. Pearson, when PFG finally heard the audio recordings of Mr. Davis during the discovery phase of this case, he was also promptly terminated. As a result, in the absence of any prior allegations of misconduct against him, PFG's decision to hire, retain, and supervise Mr. Davis was not negligent.

## VI.

In summary, we hold that PFG "demonstrate[d]" and showed the trial court "that [Ms. Bazemore's] evidence is insufficient to establish . . . an essential element of [her] claim[s]." *See* Tenn. Code Ann. § 20-6-101. The company is entitled to summary judgment.

## VII.

The trial court's grant of summary judgment in PFG's favor is affirmed. Costs on appeal are assessed to the appellant, Patricia Bazemore. This case is remanded, pursuant to applicable law, for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE